800 A.2d 915 (2002)
352 N.J. Super. 555
SITOGUM HOLDINGS, INC., a Delaware corporation, Plaintiff,
v.
Phyllis E. ROPES, a/k/a Phyllis Eline Ropes, a/k/a Phyllis Ropes, Defendant,
v.
Marlene Van Noord; Timothy P. Sullivan, individually; Neil Coles, individually; and John Doe and Jane Doe (the yet unnamed officers and directors of the Plaintiff corporation), Third-party defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
March 21, 2002.
*916 Joseph A. Deckhut, Freehold, for plaintiff.
Gerald P. Tyne, for defendant/third party plaintiff, Tyne & Tyne, Bergenfield, Attorneys.
FISHER, P.J.Ch.
The common law doctrine of unconscionability has proved difficult to define and has been rarely invoked undoubtedly because, other than in exceptional cases, it has been largely viewed as grossly interfering with the freedom to contract. Notwithstanding this philosophical discomfort, the surrounding circumstances regarding defendant's desire to sell her property provided fertile ground for, and did in fact result in, a one-sided agreement which this court finds unconscionable.[1]

I
Defendant Phyllis E. Ropes ("Mrs. Ropes") and her husband, John M. Ropes, Jr., were the owners of waterfront property in Brielle, New Jersey. This was their principal residence although they also owned a winter home in the Cayman Islands. It was in the Cayman Islands that John M. Ropes, Jr. died suddenly on January 3, 2000.
Grief-stricken, Mrs. Ropes, then 81 years old, took a number of rapid and inconsistent steps regarding the Brielle property. Apparently, not long before his death, it had been her and Mr. Rope's desire to sell the property. With his death, Mrs. Ropes almost immediately executed two separate powers of attorney on the same dayJanuary 13, 2000; one in favor of third-party defendant Marlene Van Noord and the other in favor of Linda Dowhan. On January 26, 2000 another power of attorney, prepared by plaintiff Sitogum Holdings, Inc. ("Sitogum"), was also executed by Mrs. Ropes in favor of Ms. Van Noord. The next day, Ms. Van Noord executed an option to purchase the Brielle property in favor of Sitogum.[2] This option contract, which Mrs. Ropes now claims is unconscionable, provided Sitoguman entity which would not even be incorporated for another six dayswith the right to purchase the Brielle property, within eight months, for $800,000. Sitogum *917 agreed to pay $1000 per month for this option.
A February, 2000 appraisal suggested the Brielle property was worth between $1,500,000 and $1,750,000. Apparently recognizing the windfall about to come its way, Sitogum claims to have prepaid six of its monthly $1000 payments on or about February 28, 2000.[3]
Apparently, at the same time, efforts were being made to market the property through Mrs. Ropes' other attorney-in-fact. Sitogum may have become aware of this since it recorded a "Memorandum of Option to Purchase Real Property" on or about April 11, 2000. On April 13, 2000, Mrs. Ropes executed a contract for the sale of the Brielle property to another party for $1,500,000. Upon learning of this, Sitogum, on April 28, 2000, exercised its option to purchase. Notwithstanding, Mrs. Ropes advised that she would not transfer the property to Sitogum. As a result, on May 19, 2000, Sitogum filed this suit to compel specific performance of the January 27, 2000 option agreement.[4] Mrs. Ropes now moves for summary judgment.

II
Mrs. Ropes recognizes that the claim of her alleged capacity to contract or the voluntariness of the power of attorney elude resolution by way of summary judgment.[5] Other contentions also cannot be resolved on this motion.[6] The only issue which is ripe for summary judgment is Mrs. Ropes' claim that the option contract is unconscionable.

A
The power of a court to relieve parties from unconscionable contracts has ancient roots.[7] In Earl of Chesterfield v. Janssen, *918 plaintiff borrowed 5000 pounds in exchange for his agreement to pay 20,000 pounds upon the death of his then 70-year old grandmother. In referring to the agreement as "unconscientious," the Chancellor described the power to set it aside, which still has traces in the doctrine currently applied by modern courts:
It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his sense and not under a delusion would make on the one hand, and as no honest man would accept on the other; which are unequitable and unconscientious bargains, and of such even the common law take notice.

[2 Ves. Sr. 125, 155, 28 Eng. Rep. 82, 100 (1750).]
The Supreme Court of the United States recognized this common law authority in the nineteenth century[8] and courts of equity have traditionally refused their assistance to parties who obtain such one-sided bargains.[9]
Notwithstanding its venerable history, the application of the doctrine has always been viewed as controversial and it would appear, judging from the paucity of reported decisions, that its use has been infrequent. The reason for this is undoubtedly over a heightened concern that its uncertain parameters "increase[] the potential for unreasoned or arbitrary decisions based on personal value judgments." Hillman, "Debunking Some Myths about Unconscionability: A New Framework for U.C.C. Section 2-302," 67 Cornell L.Rev. 1, 15 (1981). Courts normally examine challenges to the validity of contracts by first recognizing the parties' freedom to contract and by applying the principle that the execution of a contract manifests an intent to be bound by all its terms. See, e.g., Restatement of Contracts, § 70 (1932). As a result, the principle that courts "should not rewrite contracts," is often intoned in such disputes. See, e.g., Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717 (1960); Carroll v. United Airlines, Inc., 325 N.J.Super. 353, 358-59, 739 A.2d 442 (App.Div. 1999); Chemical Bank v. Bailey, 296 N.J.Super. 515, 527, 687 A.2d 316 (App. Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997). Regardless, however, of the unease which its potential use produces, the doctrine of unconscionability has a place in our jurisprudence so that grossly unfair or one-sided contracts may be properly "policed." White & Summers, Uniform Commercial Code (4th ed., 1995) 206; Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 549 P.2d 903 (1976).
Considering the rapid evolution of the implied covenant of good faith and fair *919 dealing in New Jersey[10]allowing for the watchful examination of the bona fides of the performance of valid contractsit is plain to see that the application of the doctrine of unconscionability to the bona fides of the creation of contracts should not be viewed as a relic, as labelled by one commentator. Brown, "The Uncertainty of U.C.C. Section 2-302: Why Unconscionability Has Become A Relic," 105 Com. L.J. 287 (2000). In appropriate cases, the doctrine of unconscionability provides a more than proper and valid basis for interdicting an inequitable result which would otherwise flow from the cold enforcement of the terms of a contract.

B
Besides existing at common law, the doctrine of unconscionability was included within the Uniform Commercial Code, becoming, as Professor Hawkland said, "undoubtedly the most controversial section in the entire Code." Hawkland, A Transactional Guide to the U.C.C., Vol. I, § 1.16 at p. 44 (1964). The Uniform Commercial Code ("the Code") handles the issue in two interesting ways. First, the Code "assigns the issue of unconscionability exclusively to the judge." White & Summers, Uniform Commercial Code (2d ed.,1980) 151. Accord, County Asphalt, Inc. v. Lewis Welding & Eng. Corp., 444 F.2d 372 (2d Cir. 1971); Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc., 913 F.Supp. 837 (D.N.J.1995); Bishop v. Washington, 331 Pa.Super. 387, 480 A.2d 1088 (1984); Smith v. Price's Creameries, 98 N.M. 541, 650 P.2d 825 (1982). Second, the Code provision contains no helpful definition or parameters, stating only:
If the court as a matter of law finds the contract of any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [N.J.S.A. 12A:2-302(1).]
The Code's official comments, intended to explain the meaning of this provision, also do not lend any great insight into what constitutes an unconscionable contract. Rather, the comment states that the "basic test" requires an examination into the general commercial background and seeks the "prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power."
The leading commentators refer to section 2-302 and the official comments as "unintelligible and abstract." Leff, "Unconscionability and the CodeThe Emporer's New Clause, 115 U. Pa. L.Rev. 485, 488-89 (1967). Professors White and Summers observed that
Experimentation with even a single case shows this litmus to be useless; in no sense is the comment an objective definition of the word. It is simply a string of hopelessly subjective synonyms ladened with a heavy "value" burden:

*920 "oppression," "unfair," or "one-sided." [White & Summers, supra, at 151.]
See also, Spanogle, "Analyzing Unconscionability Problems," 117 U. Pa. L.Rev. 931, 942 (1969) ("The terms `unfair surprise' and `oppression' are no more concretely definable than the term `unconscionable' so the Comment seems to offer slogan words rather than an explanation of the purposes behind the statute").[11]
While this criticism may be accurate, in this court's view it erroneously suggests that the imprecise defining of unconscionability is a weakness. In short, the critics' "reproof is something too round." Shakespeare, Henry V: 4.1.202 (1598-99). Unquestionably the common law rule, the Code's controversial section 2-302 and the Restatement's descriptions are general and abstract, but they also possess wisdomthe wisdom of understanding that the bright-line rule sought by the leading commentators is not only utterly elusive but also quite undesirable.[12] Instead, the erecting of parameters has been left to the courts to consider in light of their general experience with contract disputes and upon an understanding of the particular facts of each case. In short, the lawmakers undoubtedly anticipated that the skeletal unconscionability framework would be filled out through case-by-case determinations. While the risk of defining the doctrine through such a case-by-case approach is the possible loss of restraint and consistency, the advantage is a device inherently governed by the particular circumstances of each case measured against the experiences of past and present judges, the lifeblood of the common law.

C
Raising other questions about unconscionability is the fact that this case-by-case process, which began in earnest in the mid-1960's, slowed soon thereafter. Most of the decisions of note concerning the Code's unconscionability provision took place in the District of Columbia, New York and New Jersey. Unlike the present case, those decisions generally involved contracts where, due to unsophistication or lack of education, the consumer entered into a grossly unfair agreement. White & Summers, supra, at 149-50. The most important of these was Williams v. Walker-Thomas Furniture Co., 121 U.S.App. D.C. 315, 350 F.2d 445 (D.C.Cir.1965), where the consumer purchased on installment a number of household items at different times. A provision in the contract cross-collateralized all past and present purchases so that no item was ever fully paid off until the last payment was made on the last item. When a default occurred the seller sought to repossess everything. The court found this unconscionable because of an "absence of meaningful choice" at the inception of the contract coupled *921 with contractual terms "unreasonably favorable to the other party." Id. at 449.
For the most part, the unconscionability cases follow Williams v. Walker-Thomas and look for two factors: (1) unfairness in the formation of the contract, and (2) excessively disproportionate terms. Professor Leff labelled these two elements as "procedural" and "substantive" unconscionability. Leff, supra, 115 U. Pa. L.Rev. at 487. The first factorprocedural unconscionabilitycan include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. See, e.g., Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988); Complete Interiors, Inc. v. Behan, 558 So.2d 48 (Fla.App.), review denied, 570 So.2d 1303 (Fla.1990). The second factorsubstantive unconscionabilitysimply suggests the exchange of obligations so one-sided as to shock the court's conscience. See, e.g., State ex rel. Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup.Ct.1966) (purchase price/market value ratio approximately 2½ times); American Home Improvement, Inc. v. MacIver, 105 N.H. 435, 201 A.2d 886 (1964) (2½ times); Toker v. Perl, 103 N.J.Super. 500, 247 A.2d 701 (Law Div. 1968), aff'd on other grounds, 108 N.J.Super. 129, 260 A.2d 244 (App.Div.1970) (2½ times).
Most courts have looked for a sufficient showing of both factors in finding a contract unconscionable. See, e.g., Williams v. Walker-Thomas, supra; Patterson v. Walker-Thomas Furniture, 277 A.2d 111 (D.C.1971); Mobile Am. Corp. v. Howard, 307 So.2d 507, 508 (Fla.Dist.Ct.App.1975); K.D. v. Education Testing Service, 87 Misc.2d 657, 386 N.Y.S.2d 747 (Sup.Ct. 1976); Truta v. Avis Rent A Car System, Inc., 193 Cal.App. 3d 802, 238 Cal.Rptr. 806 (1987); Adams v. American Cyanamid Co., 1 Neb.App. 337, 498 N.W.2d 577 (1992). Other courts have been satisfied merely by proof of substantive unconscionability, i.e., an excessively disproportionate exchange of material promises. See, e.g., Ahern v. Knecht, 202 Ill.App.3d 709, 150 Ill.Dec. 660, 563 N.E.2d 787, 792 (1990) ("[g]ross excessiveness of price alone can make an agreement unconscionable"); MacIver, supra, 105 N.H. 435, 201 A.2d 886; Frostifresh Corp. v. Reynoso, 52 Misc.2d 26, 274 N.Y.S.2d 757 (Dist.Ct.1966), rev'd as to damages only, 54 Misc.2d 119, 281 N.Y.S.2d 964 (App.Div.1967); Toker v. Perl, supra, 103 N.J.Super. 500, 247 A.2d 701; Toker v. Westerman, 113 N.J.Super. 452, 274 A.2d 78 (Dist.Ct.1970).[13] Still other courts have determined that the two elements need not have equal effect but work together, creating a "sliding scale" of unconscionability. Funding Systems Leas. Corp. v. King Louie Intern., 597 S.W.2d 624, 634 (Mo.Ct.App.1979) ("if there exists gross procedural unconscionability then not much be needed by way of substantive unconscionability, and that the same `sliding scale' be applied if there be great substantive unconscionability but little procedural unconscionability"); Tacoma Boatbuilding, Inc. v. Delta Fishing Co., 28 UCC Rep.Serv. 26, 1980 WL 98403 n. 20 (W.D.Wash.1980) ("The substantive/procedural analysis is more of a sliding scale than a true dichotomy"); Spanogle, supra, 117 U. Pa. L.Rev. at 950 (if a *922 "court considered the terms especially harsh, only a slight procedural abuse would be necessary"); cf., Campbell Soup Co. Wentz, supra, 172 F.2d 80.[14]

D
In Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971), the Court considered the validity of contracts for the door-to-door sale of education books and materials for two and a half times a reasonable price. Speaking for the Court, Justice Francis observed, as discussed earlier, that unconscionability is not defined by the Code, and described unconscionability as
an amorphous concept obviously designed to establish a broad business ethic. The framers of the Code naturally expected the courts to interpret it liberally so as to effectuate the public purpose, and to pour content into it on a case-by-case basis. In that way a substantial measure of predictability will be achieved and professional sellers of consumer goods as well as draftsmen of contracts for their sale to ordinary consumers will become aware of the abuses the court have declared unacceptable and will avoid them. The intent of the clause is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion. Viewed in that sense, freedom to contract survives, but marketers of consumer goods are brought to an awareness that the restraint of unconscionability is always hovering over their operations and that courts will employ it to balance the interests of the consumer public and those of the sellers.

[Id. at 543-44, 279 A.2d 640.]
While the Court did not refer to procedural and substantive unconscionability in those terms, there is little question but that the Court acknowledged the importance of both: "We have no doubt that an exorbitant price ostensibly agreed to by a purchaser of the type involved in this casebut in reality unilaterally fixed by the seller and not open to negotiationconstitutes an unconscionable bargain from which such a purchaser should be relieved." Id. at 544-45, 279 A.2d 640. Within that statement, the Court included not only the need for proof of an "exorbitant price" but also the presence of a "purchaser of the type involved in this case" (i.e., a financially distressed person), and a contract "unilaterally fixed" and "not open to negotiation." In short, the Court clearly included both the procedural and substantive unconscionability concepts.
Since Kugler v. Romain, nothing has emanated from our courts, by way of published decisions, which would suggest any change or modification in that approach. Rather, the courts have repeatedly emphasized that a case-by-case approach would "pour content" into the meaning of "unconscionability." Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 472, 541 A.2d 1063 (1988); Associates Home Eq. Servs. v. Troup, 343 N.J.Super. 254, 278, 778 A.2d 529 (App.Div.2001).
The one aspect which went unmentioned in Kugler v. Romain was whether the two factors of procedural and substantive unconscionability operate on the sliding scale *923 suggested by a few courts (and mentioned above). There is a good deal of sense to the adoption of such an approach. The clear import of the doctrine of unconscionability has been its flexibility or, as Justice Francis said in Kugler v. Romain, its "amorphous" nature. 58 N.J. at 543, 279 A.2d 640. That being so, this court fails to see why such a claim should be barred if some unknown barrier for both factors is not surpassed instead of allowing such a claim to succeed when one factor is greatly exceeded, while the other only marginally so.

III
Against this flexible standard, the court must canvass the factual record to determine whether the option contract was the product of both procedural and substantive unconscionability. Since the factual contentions of the parties are not in disputeexcept for the ultimate fact as to whether this contract was unconscionableand since both parties acknowledged during oral argument they had no other facts or information to provide on this issue, the matter is ripe for summary judgment.[15]

A
The concept of procedural unconscionability arises in this case in an unusual way. That is, Mrs. Ropes' situation does not fit the pattern seen in most of the cases cited above. She was not financially vulnerable nor does it appear she was either illiterate or of limited education. But, the events in question came immediately upon her husband's unexpected death and, thus, it is fair to say that Mrs. Ropes was vulnerable to an unfair transaction, albeit in a different sense from the consumer in Williams v. Walker-Thomas and most other such cases. Certainly, the law,[16] and particularly courts of equity,[17] have shown special solicitude to persons of Mrs. Ropes' age and situation.
Also, while it may have been her own voluntary way of approaching the sale of her Brielle property, Mrs. Ropes was not directly involved in the transaction because she had given a power of attorney to Ms. Van Noord. While it is recognized that the question of Mrs. Ropes' competency or vulnerability to influence cannot be resolved on this motion, the fact that more than one power of attorney was executed at the same time[18] adds further procedural irregularities to the transaction. In addition, while Sitogum had the assistance of counsel (indeed, Sitogum appears to be made up of a consortium of attorneys), neither Mrs. Ropes nor Ms. Van Noord appeared to have received any sound advice from counsel. While counsel on the Cayman Islands assisted in the preparation and execution of certain documents, *924 there admittedly was no advice rendered as to the appropriate steps to be taken in securing the highest and best price. And the rationale behind simultaneously appointing two different attorneys-in-fact, as occurred here, both with the power to sell the same property on Mrs. Ropes' behalfwith the potential for different contracts concerning the same propertyhas not been explained or justified.
After communications with a Florida attorney regarding the sale of the Brielle property, Ms. Van Noord received yet another form of a power of attorney and a proposed option contract. Ms. Van Noord claims to have brought these papers to Mrs. Ropes, who "appeared to be nervous but certainly seemed to know what she was doing and what she wanted to do." A few days later, according to Ms. Van Noord, she received a telephone call from Mrs. Ropes indicating that she wanted to sell the property. They both went to the office of a second Cayman Islands attorney. No explanation has been offered to explain why they did not return to the Cayman Islands attorney they saw a few days earlier. Mrs. Ropes signed yet another power of attorney, apparently in the form proposed by Sitogum's Florida attorney. For reasons, also not explained, Ms. Van Noord did not then sign the option contract but did so the next day.[19] Ms. Van Noord then sent both the January 25 power of attorney and the January 26 option contract to the Florida attorney. In the same time frame, Mrs. Ropes' other attorney-in-fact reached an agreement with a different buyer.
So many questions arise from these events. Most notable is the curious fact that Mrs. Ropes did not sign the option contract, but only signed a power of attorney which authorized Ms. Van Noord to sign the option contract. Why would she first sign a power of attorney in favor of Ms. Van Noord on one day, in the presence of an attorney, allowing Ms. Van Noord to sign an option contract the next day, apparently outside the presence of an attorney, when, according to Ms. Van Noord, the option contract had already been seen and reviewed by Mrs. Ropes? Clearly, if Ms. Van Noord's version is accurate, the events in question must be found to be quite irregular. And, most incredibly, nearly all these events appeared to occur in the presence of attorneys apparently engaged to assist in Mrs. Ropes' efforts to sell the Brielle property. Accepting as true all the facts asserted by Sitogum in opposition to this motion, the court must conclude that the transactions in question, leading up to the creation of the option contract, were most unusual and made in the absence of the meaningful representation of counsel. Neither Mrs. Ropes nor those acting on her behalf obtained the type of zealous and careful advocacy required by aged persons or, for that matter, any other person in Mrs. Ropes' situation.[20] While the present record does not yet suggest sufficient irregularity about the procedural events as to rise to the level of fraud, at best Mrs. Ropes' attorney-in-fact exhibited only some desultory interest in obtaining fair value for the property. The court is satisfied that a sufficient degree of procedural *925 unconscionability is present to permit examination into the substantive fairness of the contract.

B
Most startling about this transaction is the size of the purchase price locked in by the option contract. As indicated, Ms. Van Noord entered into the option contract without having engaged professional assistance for determining the value of the Brielle property. As a result, the price set by the option contract was $800,000, a figure apparently discussed and considered by Mrs. Ropes' husband prior to his untimely death. However, as later revealed, the Brielle property's true value was approximately twice that amount. An appraisal rendered by Diane Turton Realtors, at the request of Mrs. Ropes' current counsel, opined that the value of the property ranged between $1,500,000 and $1,750,000 and, in fact, the property was ultimately sold for $1,500,000. The great disparity between the $800,000 at which Sitogum had gained the right to purchase the property for and the later appraisal and the ultimate sale of the property to others for nearly twice that much demonstrates the substantive unconscionability of the option contract.
In seeking to defeat the claim of substantive unconscionability, Sitogum observes that Ms. Van Noord believed Mrs. Ropes was more concerned about disposing of the property than the price. In her answers to interrogatories, Ms. Van Noord swore to the following facts:
[Mrs. Ropes] was adamant that she wanted the "Brielle property off my back." [Ms. Van Noord] counseled [Mrs. Ropes] in the presence of everyone to not do anything rash, to be patient. [Mrs. Ropes] kept stating that she wanted the property off her back, regardless of the content of houseregardless of the pricejust sell it. [Ms. Van Noord] accompanied [Mrs. Ropes] to at least three or four meetings with Mr. Broadbent [the first of the two Cayman Island attorneys mentioned earlier]. During each of those conversations, I remember that there was a desire by [Mrs. Ropes] to get rid of, to just sell the Brielle property in New Jersey.
If those facts are trueas the court presently assumesit becomes apparent that Ms. Van Noord did not act consistently with that goal. Not only did she obligate Mrs. Ropes to sell for approximately half the property's value, but she failed to "get the property off" Mrs. Ropes' back. Instead, Ms. Van Noord entered into an option contract which had the potential of tying up the property for eight months, without any guarantee of it actually being sold. Within that eight month period, Sitogum could unilaterally determine whether it would purchase the property; if Sitogum chose to walk away, Mrs. Ropes would be left where she started. And, if Sitogum decided to purchase within the initial eight month period, the transaction need not actually occur for yet another 90 days.[21] So, the result of the option contract was to require Mrs. Ropes to potentially *926 wait for as long as 11 months to be "rid" of the property at an unreasonably low price. The contention that this option contract is not unconscionable because Mrs. Ropes allegedly did not care about the price (so long as it was at least $800,000) if the property could be gotten rid of quickly is proved fallacious in light of the terms of the option contract. And the option contract appears all the more unconscionable when it is observed that Mrs. Ropes received no consideration for tying up the property for potentially eight months (and possibly eleven months) if Sitogum ultimately decided to purchase because the option paymentswhich were either never sent, sent but not received, or received by Ms. Van Noord but lost, purloined, or at least never given to Mrs. Ropes[22]were to be deducted from the purchase price. On the other hand, if Sitogum determined not to exercise the option, then Mrs. Ropes would only have benefitted to the meagre tune of $1000 per month,[23] and still would not have been rid of the property.
While the existing case law does not precisely define what exchange of promises might be classified as "substantively unconscionable," certainly a price $700,000 less than what the property ultimately sold for meets this court's definition of unconscionability.

IV
For the foregoing reasons, Mrs. Ropes' motion for summary judgment will be granted, declaring the option contract void ab initio. While questions about the unconscionability of contracts normally would suggest the presence of factual disputes, it seems clear, in accepting the truth of Sitogum's allegations and in light of the parties' acknowledgement that there are no other sources of factual information known to them, that summary judgment is available at this stage of the litigation. This seems particularly true considering the fact that determinations of unconscionability are matters left exclusively to the court for resolution.
An appropriate order has been entered.
NOTES
[1] The matter is before the court by way of defendant's motion for summary judgment. There do not appear to be any disputed questions of fact and the parties agree there are no other facts available concerning this issue. Accordingly, the application of the doctrine of unconscionability in this case turns on its sufficiency as a matter of law. In reciting the facts relating to this contention, the court will also give plaintiff, as the opponent of the motion, all reasonable inferences to be drawn from the facts provided.
[2] According to Sitogum, on January 19, 2000only 3 days after the execution of the power of attorney and 16 days after Mr. Ropes diedMs. Van Noord received a telephone call from a Florida attorney expressing an interest in the Brielle property. No explanation has been provided by Sitogum as to how this Florida attorney came to learn of the property or Mrs. Ropes' desire to sell it.
[3] Whether this payment was actually made is a genuinely disputed fact. Sitogum contends that it was mailed to Ms. Van Noord's Cayman Islands address; Ms. Van Noord claims not to have received it. For present purposes, in light of this factual dispute, the court assumes the payment was made.
[4] On March 14, 2001, an order was entered which (1) permitted the sale of the property to this other contracting party for $1,500,000, (2) discharged the notice of lis pendens filed by Sitogum, and (3) required that the net proceeds be placed in escrow pending final judgment or such other order of the court.
[5] That is, the motion invites the court to assume, for present purposes only, that Mrs. Ropes was of sound mind in January 2000, that she freely and voluntarily provided a power of attorney to Marlene Van Noord, that the power of attorney was given the day before the option contract was executed and that the power of attorney authorized Ms. Van Noord to sign the option contract. Db at 6-7.
[6] Besides the claim of unconscionability, the motion was based on two points. The first relies on the factapparently, undisputedthat Sitogum was not incorporated at the time the option contract came into existence; as a result, Mrs. Ropes contends there could be no valid contract. However, a court of equity could conclude that the lack of certain ministerial steps to the creation of a corporation need not preclude the enforceability of a contract made by such a nascent entity. Second, Mrs. Ropes contends there was a default in the timely submission of the monthly $1000 payments required by the option contract and, thus, there was either no consideration for the attorney-in-fact's promise to sell or Sitogum otherwise breached the option contract. The parties dispute whether those payments were made. And, while the $6000 prepayment may have been mailed or received a few days late does not necessarily relieve Mrs. Ropes of her obligations under the option contract. There is nothing in the present record to suggest that time was of the essence for those $1000 payments. The option contract states only that "[t]ime is of essence of this option." The emphasized portion might suggest that time was of the essence of the exercise of the option, not the $1000 payments.
[7] Roman law recognized the doctrine of "laesio ultra dimidum vel enormis" which permitted rescission upon a disproportionate exchange of promises. The doctrine is defined in Black's Law Dictionary (7th ed., 1999) as "the injury sustained by one party to an onerous contract when the overreaching party receives twice the value of the party's money or property, such as a purchaser who pays less than half of the value of the property sold, or a seller who receives more than double the property's value."
[8] See, Eyre v. Potter, 56 U.S. 42, 45, 15 How. 42, 14 L.Ed. 592 (1853) ("A disposition of property so revolting to common sense and natural affection ought to be looked upon with suspicion"); Hume v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889) (quoting Earl of Chesterfield, supra with approval).
[9] In Campbell Soup Co. v. Wentz, 172 F.2d 80, 83-84 (3d Cir.1948), Judge Goodrich emphasized this point: "We think it is too hard a bargain and too one-sided an agreement to entitle the plaintiff to relief in a court of conscience.... We do think, however, that a party who has offered and succeeded in getting an agreement as tough as this one is, should not come to a chancellor and ask ... help in the enforcement of its terms. That equity does not enforce unconscionable bargains is too well established to require elaborate citation." See also, 4 Pomeroy, Equity Jurisprudence (5th ed., 1941), § 1405a; 5 Williston, Contracts, § 1425 (Rev.ed., 1937).
[10] See, Wilson v. Amerada Hess Corporation, 168 N.J. 236, 773 A.2d 1121 (2001); R.J.Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co., 168 N.J. 255, 773 A.2d 1132 (2001); Sons of Thunder v. Borden, Inc., 148 N.J. 396, 690 A.2d 575 (1997); Onderdonk v. Presybterian Homes, 85 N.J. 171, 425 A.2d 1057 (1981); Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 351 A.2d 349 (1976); Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 207 A.2d 522 (1965); Seidenberg v. Summit Bank, 348 N.J.Super. 243, 791 A.2d 1068 (App.Div. 2002); M.J. Paquet, Inc. v. N.J. Dept. of Transp., 335 N.J.Super. 130, 761 A.2d 122 (App.Div.2000), certif. granted, 167 N.J. 635, 772 A.2d 937 (2001); Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159 (3d Cir.2001).
[11] The Restatement (Second) of Contracts, § 208 (1981) uses language similar to the Code. The case at hand is not governed by the Code because it concerns a contract involving a transfer of real estate and not a sale of goods. See, N.J.S.A. 12A-2-102. Nevertheless, because there is no reason to believe that the definition of unconscionability would have a different scope outside the parameters of the Code, it is helpful to consider the cases emanating from all areas. Indeed, section 2-302 has been fairly described by one commentator as being nothing more than a "restatement of common law." Davenport, "Unconscionability and the Uniform Commercial Code," 22 U. Miami L.Rev. 121, 123 (1967).
[12] While critical of the phrasing of 2-302 and the Code's comments, Professors White and Summers also recognize that such criticism is unrealistic: "It is not possible to define unconscionability. It is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." White & Summers, supra, at 151.
[13] There do not appear to be any decisions where procedural unconscionability was present but not substantive unconscionability. This should not come as any surprise. No matter how the contract came about, it would be unlikely that a party would complainor a court would listenif the contract was otherwise fair or reasonable. It would be much like arguing about negligent conduct which failed to result in any damage.
[14] It should also be recognized that the doctrine acts as a shield against enforcement of an unreasonable contract and not as a sword on a claim for affirmative relief. See, Lewis v. Hertz Corp., 181 A.D.2d 493, 581 N.Y.S.2d 305 (1st Dept.), app. dis., 80 N.Y.2d 893, 587 N.Y.S.2d 909, 600 N.E.2d 636 (1992).
[15] As noted earlier, the Code leaves the question of unconscionability to the court's determination. It is not clear whether this is also true when the contract, as here, is not governed by the Code. This is undoubtedly so because the issue normally arises in matters where rescission or some other equitable remedy is sought and, thus, in actions brought in chancery courts where the judge is both the trier of the law and the trier of the facts. Indeed, because this action is also a non-jury chancery matter, this court need not decide whether a finding of unconscionability is for the judge or a jury to decide.
[16] See, e.g., N.J.S.A. 52:27G-1.
[17] See, e.g., Bergen Eastern Corp. v. Koss, 178 N.J.Super. 42, 427 A.2d 1132 (App.Div.), app. dis., 88 N.J. 499, 443 A.2d 713 (1981).
[18] According to Ms. Van Noord, "on or about January 13, 2000, a Power of Attorney, separate documents, one to me and one to Linda Dowhan were prepared by Mr. Broadbent and signed by Phyllis Ropes. These Powers of Attorney were signed before the Will was signed and again were given to both myself and Linda Dowhan."
[19] The name of the witness to Ms. Van Noord's signature on the option contract is not indicated and the signature indecipherable.
[20] The court does not find that Mrs. Ropes' apparent carelessness regarding the marketing of the property in this fashion (assuming, arguendo, it came about through carelessness or foolishness and not some lack of capacity) an obstacle to the application of the doctrine of unconscionability. Accord, Fotomat Corp. of Florida v. Chanda, 464 So.2d 626 (Fla.App. 1985).
[21] The option contract, prepared by Sitogum's representatives, does not indicate precisely when Sitogum would be obligated to tender the purchase price. It does say that the option must be exercised within eight months, but it also states that the option is exercised by Sitogum "giving optionor written notice thereof, signed by optionee, before the time herein set for expiration." The contract then indicates that Mrs. Ropes would be obligated to deliver a warranty deed "[w]ithin 90 days after receipt of such notice." Without clarity as to the time for the tender of the purchase price, Mrs. Ropes was further faced with the potential that the purchase price might not be tendered for approximately 11 months from the formation of the option contract.
[22] Ms. Van Noord indicates in her answers to interrogatories that she "was recently advised that a check for $6,000.00 was sent to my home in the Cayman Islands. This check was never received by me. At the time this check was allegedly sent, the condominium association where I lived was going under new management and the post office address for the old association changed. This is the only reason I can think of that I did not receive this check."
[23] Paragraph 4 of the option contract states: "If optionee purchases the property described in this option, and under the terms and conditions hereof, the consideration paid for this option shall be applied to the purchase price."