**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3282-24

LEROY KAY,

    Plaintiff-Respondent,

v.

BLOOMFIELD-COOPER JEWISH CHAPELS, MARK R. HARRIS (individually and as Manager), ANTHONY GERAHTY, MELANIE-CHONGOLOLA-NESTOR, SARA GIUSTINO TOLAND, ROBERT P. SZEGETI, JAIME MAYNARD (all individually and as Funeral Directors), SUSAN BATKO, (individually and as Advanced Planning Director),

    Defendants-Appellants,

and

DIGNITY MEMORIAL CORPORATION,

    Defendants.

_____

Submitted November 5, 2025 – Decided March 2, 2026

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2407-22.

Anselmi & Carvelli, LLP, attorneys for appellants (James Harry Oliverio, on the briefs).

Robin Kay Lord, LLC, attorneys for respondent (Robin Kay Lord, on the brief).

PER CURIAM

Defendants SCI New Jersey Funeral Services, LLC, d/b/a Bloomfield-Cooper Jewish Chapels, improperly pled as Bloomfield-Cooper Jewish Chapels, its manager, and several directors appeal from the May 16, 2025 Law Division order denying their motion to compel arbitration and dismiss plaintiff Leroy Kay's complaint without prejudice. The complaint arose out of defendants providing mortuary services to plaintiff, an eighty-five-year-old widower who lost his wife of sixty-three years on October 3, 2020, when she died in her sleep at their home. The complaint alleged defendants mishandled the burial and included causes of action for: loss of right to interment; breach of contract; violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to 227; negligent and intentional infliction of emotional distress; and negligence.

The case returns to us following a remand directing the trial judge to conduct limited discovery to address "the formation of the operative agreement

2

and specifically whether the parties agreed to arbitrate any disputes." Kay v. SCI N.J. Funeral Servs., LLC, No. A-2421-22 (App. Div. Jan. 9, 2024) (slip op. at 1). In accordance with our instructions, the judge conducted a plenary hearing and, on May 5, 2025, issued a comprehensive written opinion followed by a May 16, 2025 order denying defendants' motion to compel arbitration. The judge concluded "the particular setting existing during the contract formation process render[ed] th[e c]ontract unenforceable." On appeal, defendants argue the judge's decision is not supported by the evidence and is contrary to law. We disagree and affirm substantially for the reasons explained in the judge's sound written opinion.

I.

We recount the facts underlying the parties' dispute as set forth in our previous decision:

> The dispute arose from a disastrous mishap that occurred when defendants mishandled plaintiff's deceased wife's body while performing the mortuary services shortly after her death.
>
> In his ensuing complaint, . . . plaintiff asserted that he and his wife, Janet Kay, were "of the Jewish faith" and wished to be buried in accordance with its tenets. As a result, plaintiff contacted defendants because they held themselves out as "specializ[ing] in Jewish mortuary services," and on October 3, 2020, defendants took possession of the body along with

3

specific clothing and jewelry for the burial. Plaintiff averred in his complaint that "a contract was formed" between plaintiff and defendants the following day, October 4, 2020, "for mortuary services," and for Janet's remains to be "entombed" at "Mount Sinai Cemetery in Morganville." Plaintiff and defendants agreed that the funeral would take place on October 6, 2020, and that defendants would prepare and transport Janet's body to the cemetery.

According to the complaint, about sixty "friends and family [members]" gathered with plaintiff at Mount Sinai Cemetery on October 6, 2020, for the scheduled funeral service. However, after a prolonged delay, defendant's representative contacted plaintiff and asked questions "indicat[ing] that they had lost the remains of [the decedent]." During a FaceTime call initiated by the representative, plaintiff and family members were shown a deceased woman who was not plaintiff's wife but wearing her clothing and jewelry. Plaintiff and the guests were distraught. Nevertheless, due to the number of family and friends who had traveled to attend the service, the service continued at the mausoleum without Janet's body.

The complaint asserted that later in the day, defendants contacted plaintiff and informed him that Janet "was found . . . buried in [n]orthern New Jersey" "in the wrong cemetery," "in the wrong clothes," "with another woman's jewelry" and "next to a deceased man she [did] not know." The following day, October 7, 2020, after Janet's exhumation was approved, her body was disinterred from the northern New Jersey burial site. On October 8, 2020, after plaintiff's daughter travelled to defendants' facilities in Manalapan to identify Janet's decomposing body, Janet's final funeral service was held with members of the immediate family in attendance. At the conclusion of the

4

service, defendants' representative "had [plaintiff] sign a contract" without "explaining" or "giving him the opportunity to review the document."

[Kay, slip op. at 3-5 (alterations and omissions in original) (footnote omitted).]

The three-page contract, which was dated October 4, 2020, contained two arbitration provisions:

> The first provision, located on the second page above the signature line, read, "NOTICE: BY SIGNING THIS AGREEMENT, YOU ARE AGREEING THAT ANY CLAIM YOU MAY HAVE AGAINST THE SELLER SHALL BE RESOLVED BY ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A COURT OR JURY TRIAL AS WELL AS YOUR RIGHT OF APPEAL." (Boldface omitted). A statement incorporating terms and conditions from the third page of the contract appeared above the notice referenced above, stating: "SEE OTHER SIDE FOR TERMS AND CONDITIONS THAT ARE PART OF THIS AGREEMENT. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. YOU ACKNOWLEDGE RECEIPT OF AN EXACT COPY OF THIS AGREEMENT." (Boldface omitted).
>
> The referenced terms and conditions on the third page included an arbitration provision that read in pertinent part:
>
> > ARBITRATION: YOU AGREE THAT ANY CLAIM YOU MAY HAVE RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT (INCLUDING ANY

5

CLAIM OR CONTROVERSY REGARDING THE INTERPRETATION OF THIS ARBITRATION CLAUSE) SHALL BE SUBMITTED TO AND FINALLY RESOLVED BY MANDATORY AND BINDING ARBITRATION IN ACCORDANCE WITH THE APPLICABLE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"); PROVIDED, HOWEVER, THAT THE FOREGOING REFERENCE TO THE AAA RULES SHALL NOT BE DEEMED TO REQUIRE ANY FILING WITH THAT ORGANIZATION, NOR ANY DIRECT INVOLVEMENT OF THAT ORGANIZATION. THE ARBITRATOR SHALL BE SELECTED BY MUTUAL AGREEMENT OF THE PARTIES. IF THE PARTIES FAIL TO OR ARE UNABLE TO AGREE ON THE SELECTION OF AN APPROPRIATE ARBITRATOR, THE AAA SHALL SELECT THE ARBITRATOR PURSUANT TO ITS RULES AND PROCEDURES UPON THE APPLICATION OF ONE OR BOTH PARTIES. THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY CLAIM OR DISPUTE BETWEEN OR AMONG THE SELLER, YOU AS THE PURCHASER, ANY PERSON WHO CLAIMS TO BE A THIRD PARTY BENEFICIARY OF THIS AGREEMENT, ANY OF THE SELLER'S EMPLOYEES OR AGENTS, ANY OF THE SELLER'S PARENT, SUBSIDIARY, OR AFFILIATE CORPORATIONS, AND

ANY OF THE EMPLOYEES OR AGENTS OF THOSE PARENT, SUBSIDIARY OR AFFILIATE CORPORATIONS.

[(Boldface omitted).]

[Id. at 5-7 (first alteration added).]

Relying on the arbitration provision, defendants moved pursuant to Rule 4:6-2(a) to dismiss the complaint and compel arbitration.

> In a certification opposing defendants' motion, plaintiff averred that he signed the contract on October 8, 2020, not October 4, 2020. Plaintiff asserted he signed the contract "on a podium . . . placed in front of [him] in the mausoleum" following his wife's funeral service "after having seen [his] wife's partially decomposed body." Plaintiff certified he "was instructed to . . . sign what [he] believed to be an invoice presented by [defendant] Anthony Gerahty," one of the funeral directors. According to plaintiff, Gerahty "claimed that it needed to be signed so that the funeral home could 'pick up the bill.'" Plaintiff stated "[a]t no point [has he] ever been asked to . . . nor . . . paid . . . [d]efendants for the services and arrangements for [his] wife's funeral" and "at no time prior to October 8, 2020, did [he] ever discuss an arbitration agreement with . . . [d]efendants."
>
> [Id. at 7-8 (alterations and omissions in original).]

The motion judge denied defendants' motion. Id. at 9. In an oral decision, the judge found the October 8, 2020 arbitration provision "contain[ed] the required mutual assent required to enforce an arbitration provision," "'the terms

7

. . . [were] clear and unambiguous,' and plaintiff's dispute . . . fell "within the scope" of the agreement." Id. at 9-10 (alterations in original). Nevertheless, "the judge declined to enforce the agreement to arbitrate on the ground of 'unconscionability.'" Id. at 10.

Defendants appealed, arguing, among other things, "that without limited discovery, invalidating the arbitration provision on unconscionability grounds was not supported by adequate, substantial, and credible evidence." Id. at 18. We acknowledged "that the written agreement was a contract of adhesion, presented to plaintiff for signature on a take-it-or-leave-it basis, after the funeral services had already been rendered and leaving nothing for plaintiff to negotiate." Id. at 17-18. After reviewing plaintiff's certification opposing defendant's motion to compel arbitration, we agreed that limited discovery was appropriate "to permit a full and proper consideration of the Rudbart[ v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344 (1992)] factors," and remanded for "further discovery and factual findings on those factors." Kay, slip op. at 18.

Specifically, in Rudbart, our Supreme Court held:

> [I]n determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the

contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract.

[Id. at 356.]

On remand, Judge Kathleen A. Sheedy conducted a plenary hearing during which plaintiff and defendant Gerahty testified. Plaintiff detailed his educational background, having received an "Associate of Science" degree from a "[c]ommunity [c]ollege," and taking "some course work . . . for about a year at the University of Miami," but not graduating. He testified about his business sophistication, confirming he owned a "medium-sized" "HVAC" company that did "commercial projects" "as low as [$]500,000 to sometimes more than $10 million in value." However, he acknowledged his role mostly involved "estimating," as his wife was responsible for "put[ting] together the bids" and "manag[ing] the business." He added he was not "involved in any type of business dealings after [his] retirement in . . . 2000" but assumed the role of full-time caretaker for his then ailing wife.

Plaintiff described the events of October 6, 2020, the original date of his wife's funeral. According to plaintiff, "people from all over . . . were waiting for [plaintiff's] wife to be brought in." When "it never happened," he questioned the rabbi, who learned that defendants were "having a problem . . . bringing the

body." A short time later, plaintiff was told "there was a mix-up" and someone "Face[T]imed" "what they thought was [his] wife" but "[i]t was a different person" dressed in his "wife's clothes" and "jewelry." The rabbi then told plaintiff "they had buried [his] wife in another cemetery." Plaintiff testified that ultimately, his wife's body was exhumed, which is contrary to the Jewish faith.

Plaintiff also testified about his experience on October 8, 2020, the day he signed the contract. According to plaintiff, just prior to the service at the mausoleum, plaintiff made a visual identification of his wife's "decomposing" body.[1] After his wife's body was sealed in the mausoleum and "everybody was leaving," plaintiff recalled Gerahty "presented [him] with the documents to sign" at the podium. After plaintiff "signed page one," Gerahty "lifted up page one," exposed "page two," and "point[ed] to where [plaintiff] had to sign."

Plaintiff testified the process lasted "a couple [of] minutes." Plaintiff's children were not "at the podium with [him]" and no one had "mention[ed] the word 'arbitration' to [him]." As he signed the document, plaintiff only recalled being told it was "an invoice" and "the cost would be taken care of." Although plaintiff was not pressured by Gerahty, plaintiff did not read the document prior

---

[1] "[D]ue to her Jewish faith and her wishes, [plaintiff's wife] was never embalmed."

to signing. Plaintiff remembered wanting to "just get rid of it" so that he could "say[] goodbye to [his] family." Plaintiff described his emotional state as "distraught" and said he was not "thinking clearly."

Gerahty's testimony about his role in the signing of the document was largely consistent with plaintiff's. Gerahty confirmed he "arranged . . . [the] funeral services for [plaintiff's] wife." Although Gerahty went over the charges with plaintiff "line for line" on October 4, 2020, prior to the funeral, he admitted he "never discussed arbitration with [plaintiff] at all at any time." Gerahty added that prior to the lawsuit, he "had no idea whatsoever that there was an arbitration provision contained in th[e] contract."

Gerahty explained that typically, "Bloomfield would have sent th[e] contract out to the family" for signing "by email." However, plaintiff "didn't receive anything . . . prior to the services" because of a "glitch" in their computer system. Instead, the signing took place "less than a half an hour" after plaintiff saw his wife's body at the mausoleum.[2] Gerahty confirmed he presented "the funeral contract" to plaintiff at the podium and explained that "under the circumstances[,] . . . there would be no charge to the family for anything." Gerahty then "showed [plaintiff] where to sign." According to Gerahty, the

---

[2] Gerahty acknowledged plaintiff's wife's body showed signs of dehydration.

actual signing lasted "less than two minutes." Gerahty described plaintiff as "very sad" and "very upset."

Following the hearing, Judge Sheedy issued a comprehensive written decision on May 5, 2025. In her decision, she found the testimony of both plaintiff and Gerahty credible, made detailed factual findings based on the testimony, applied the Rudbart factors to her findings, and concluded "the agreement [was] unenforceable as unconscionable." As to the first factor, "the subject matter of the contract," Rudbart, 127 N.J. at 356, the judge found while a contract for burial services is "a difficult contract to enter into even under the best of circumstances," the circumstances here "made entry into the contract even more difficult." As to the second factor, "the parties' relative bargaining positions," ibid., the judge acknowledged plaintiff "was an accomplished, sophisticated businessman" but found "the circumstances . . . rendered him nearly helpless in th[e] situation." Further, according to the judge, "the uncontroverted testimony of [p]laintiff demonstrate[d] that the business was truly a family business where [plaintiff's wife] was responsible for contract negotiations and [plaintiff] did estimates."

As to the third factor, "the degree of economic compulsion motivating the 'adhering' party," ibid., the judge noted "Gerahty described the situation as a

nightmare and described [plaintiff] as distraught." The judge added "[p]laintiff was led to believe" by Gerahty that signing the document "was a mere formality since [p]laintiff was not being charged for the . . . blundered burial services." The judge pointed out "Gerahty testified that he never discussed [a]rbitration with [plaintiff] and didn't know if [plaintiff] received a copy of the document he signed." Further, "the [a]rbitration clause was contained on a page that did not require a signature." According to the judge, "[t]he contract could have and should have been presented to . . . plaintiff before the final interment of [his wife]" but was "only presented after the services were completed and . . . presented in a fashion that any reasonable person would think was simply a formality to get it over with since . . . [p]laintiff was not to be charged."

The judge elaborated:

> [Plaintiff] testified that at the time of signing, he didn't read the terms and conditions and viewed the signing of the document as something to just get out of the way. He was distraught and the exchange only took a few minutes. He never saw the documents prior to the sealing of his wife's body in the mausoleum. He also testified that . . . Gerahty didn't do anything to prevent him from reading the document. He didn't feel threatened. He didn't feel pressured. . . . Gerahty wasn't deliberately hiding anything. [Plaintiff] confirms that . . . Gerahty pointed out where he was to sign, lifting the pages to show him where to sign.

As to the fourth factor, "the public interests affected by the contract,"

ibid., the judge found "[t]he circumstances surrounding th[e c]ontract are so oppressive and inconsistent with the vindication of public policy, that it would be unconscionable to permit its enforcement."  The judge explained:

> [T]his [c]ourt is convinced that the particular setting existing during the contract formation process renders th[e c]ontract unenforceable.  While [plaintiff] successfully ran and sold a multimillion-dollar business, he had retired [twenty] years earlier.  He was clearly devoted to his wife of [sixty-three] years, including being her caretaker both before and at the time of her death.  The death of his wife was, no doubt, a difficult time in [plaintiff]'s life, but the actions of . . . [d]efendant[s] turned a difficult time into a nightmare.  On October 8, 2020, at the time of the signing of the [a]greement, the services were completed. . . . [D]efendant[s] had mixed up the bodies. [Plaintiff's wife] had been interred in a cemetery . . . not in accordance with her wishes, disinterred against the rules of their religion[,] and sealed in the mausoleum . . . .  [Plaintiff] had within the hour before signing the documents viewed what he described as his wife's decomposing body.  While . . . Gerahty didn't describe [plaintiff's wife]'s body as decomposing, he did describe her body as dehydrated.  The documents were never presented to [plaintiff] prior [to] October 8, 2020.  He was directed where to sign and advised that the document contained what the funeral charges would have been but was further advised that he was not going to have to pay for those services.  [Plaintiff] viewed the signing of the document as something he had to get over with.  He was also described as distraught by . . . Gerahty.  Clearly, those circumstances not only demonstrate but demand that the contract be found unenforceable.  The "horrendous series of events" acknowledged by the [a]ppellate [c]ourt were

14

confirmed and expounded upon by the testimony of both [plaintiff] and . . . Gerahty. The testimony of both individuals was at times painful to listen to.

The judge entered a memorializing order and this appeal followed.

On appeal, defendants argue in deciding the conscionability issue, the judge's decision "was not supported by adequate, substantial[,] and credible evidence." Defendants further argue "upon making the finding of procedural unconscionability," the judge "was required to find some degree of substantive unconscionability, which [she] did not do." Additionally, defendants argue, the contract "contains a valid delegation provision that [p]laintiff ha[d] never specifically challenged," and, as such, the judge "should have delegated the conscionability issue to an arbitrator."

## II.

"We review a trial court's order granting or denying a motion to compel arbitration de novo because the validity of an arbitration agreement presents a question of law." Santana v. SmileDirectClub, LLC, 475 N.J. Super. 279, 285 (App. Div. 2023) (citing Skuse v. Pfizer, Inc., 244 N.J. 30, 46 (2020)). As a result, "we need not defer to the interpretative analysis of the trial . . . courts unless we find it persuasive." Skuse, 244 N.J. at 46 (quoting Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 316 (2019)). On the other hand,

factual findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Cumberland Farms, Inc. v. N.J. Dept. of Env't Prot., 447 N.J. Super. 423, 437 (App. Div. 2016) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Ibid. (quoting Seidman 205 N.J. at 169).

Like the federal policy, "New Jersey has a long-standing policy favoring arbitration as a means of dispute resolution." Santana, 475 N.J. Super. at 285; see also Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 133 (2020) ("Like the federal policy expressed by Congress in the FAA,[3] 'the affirmative policy of this State, both legislative and judicial, favors arbitration as a mechanism of resolving disputes.'" (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 92 (2002))). However, that "favored status . . . is not without limits." Santana, 475 N.J. Super. at 285 (omission in original) (quoting Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 23 (App. Div. 2021)).

As such, "[a]n arbitration agreement must be the result of the parties' mutual assent, according to customary principles of state contract law." Skuse, 244 N.J. at 48 (citing Atalese v. U.S. Legal Servs. Grp., LP, 219 N.J. 430, 442

---

[3] FAA refers to the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

(2014)). Thus, "[t]he first step in considering [the] plaintiff's challenge to enforcement of an arbitration requirement must be to determine whether a valid agreement exists." Martindale, 173 N.J. at 83; see N.J.S.A. 2A:23B-6(b) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."). While parties can agree to arbitrate arbitrability through a delegation clause, see Goffe v. Foulke Management Corp., 238 N.J. 292, 195-96 (2019), delegation clauses must be "clear and unmistakable" to overcome the presumption that "a court, not an arbitrator, decides any issue concerning arbitrability," Morgan v. Stanford Brown Institute, 225 N.J. 289, 303-06 (2016).

In determining validity, "arbitration agreements may not be subjected to more burdensome contract formation requirements than th[ose] required for any other contractual topic." Martindale, 173 N.J. at 83. As such, "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]," Muhammad v. Cnty. Bank of Rehoboth Beach, 189 N.J. 1, 12 (2006) (emphasis omitted), and, in New Jersey, "[i]t is well settled that courts 'may refuse to enforce contracts that are unconscionable,'" id. at 15 (quoting Saxon Constr. & Mgmt. Corp. v. Masterclean of N.C., Inc., 273 N.J. Super. 231, 236

(App. Div. 1994)).

There are two types of unconscionability, procedural and substantive. Delta Funding Corp. v. Harris, 189 N.J. 28, 55 (2006) (Zazzali, J., concurring in part and dissenting in part) (citing Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564-65 (Ch. Div. 2002)). Procedural unconscionability includes "a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." Muhammad, 189 N.J. at 15 (quoting Sitogum Holdings, Inc., 352 N.J. Super. at 564-66).

"[S]ubstantive unconscionability, 'simply suggests the exchange of obligations so one-sided as to shock the court's conscience.'" Estate of Cohen ex rel. Perelman v. Booth Computers, 421 N.J. Super. 134, 158 (App. Div. 2011) (quoting Sitogum Holdings, Inc., 352 N.J. Super. at 565).

> New Jersey case law "clearly include[s] both the procedural and substantive unconscionability concepts," but those concepts are applied flexibly. Sitogum Holdings, Inc., 352 N.J. Super. at 567-68. "[T]his court fails to see why . . . a[n unconscionability] claim should be barred if some unknown barrier for both factors is not surpassed instead of allowing such a claim to succeed when one factor is greatly exceeded, while the other only marginally so." Id. at 567.
>
> [Booth Computers, 421 N.J. Super. at 158 (alterations and omissions in original) (citation reformatted).]

A-3282-24

Terms within a contract of adhesion, "[a] contract where one party . . . must accept or reject the contract," Rudbart, 127 N.J. at 353 (alteration in original) (quoting Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 104 (1980)), "necessarily involve indicia of procedural unconscionability," Muhammad, 189 N.J. at 15 (citing Rudbart, 127 N.J. at 356). "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." Ibid. (quoting Rudbart, 127 N.J. at 353). "The determination that a contract is one of adhesion, however, 'is the beginning, not the end, of the inquiry.'" Ibid. (quoting Rudbart, 127 N.J. at 354).

As such, a contract of adhesion is not by its nature alone unenforceable. Rudbart, 127 N.J. at 354. Instead, as the Court set forth in Rudbart, courts should look to additional factors. Id. at 356. These factors "determine whether the contract is so oppressive, or inconsistent with the vindication of public policy, that it would be unconscionable to permit its enforcement." Delta Funding Corp., 189 N.J. at 40 (citations omitted). Where there are allegations of unconscionability, courts must conduct a fact-sensitive analysis. Muhammad, 189 N.J. at 15-16. But the burden of proving the defense of unconscionability is on the party challenging the enforceability of the agreement. Martindale, 173

N.J. at 91.

Applying these principles, we agree with Judge Sheedy's ruling that the arbitration provision is unenforceable as unconscionable and affirm substantially for the reasons expressed in the judge's thoughtful written decision. We are satisfied the judge's factual findings are amply supported by substantial, credible evidence in the record.[4] We reject defendants' contention that without a finding of "some degree of substantive unconscionability," plaintiff's claim fails. We are satisfied that in the unique circumstances of this case, the "flexibility" encompassed in "the doctrine of unconscionability" allows plaintiff's claim to succeed. Sitogum Holdings, Inc., 352 N.J. Super. at 567.

Equally unavailing is defendants' argument that the unconscionability issue should have been delegated to an arbitrator pursuant to the arbitration provision's delegation clause. To the extent the arbitration provision may have

---

[4] Defendant argues the judge's holding relied on "the erroneous belief that the page plaintiff signed did not contain an arbitration provision," pointing to parts of the judge's opinion where she referred to an "[a]rbitration clause" "contained on a page that did not require a signature." However, the judge acknowledged that the contract "had two provisions that referenced [a]rbitration." The judge's reliance on the placement of the arbitration clause in reaching her decision was not "manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cumberland Farms, 447 N.J. Super at 437-38 (quoting Ceasre v. Ceasre, 154 N.J. 394, 411-12 (1998)).

contained a delegation clause, <u>see</u> <u>Morgan</u>, 225 N.J. at 303-06, we previously held plaintiff's challenge was sufficient to require the trial court to determine threshold questions of enforceability. <u>Kay</u>, slip op. at 16.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3282-24