CALABRESI, Circuit Judge,
dissenting:
I would affirm the District Court’s judgment that the post-injury agreement compelling arbitration is in this case unconscionable under New Jersey law. More importantly, I would answer a threshold question differently from the majority and conclude that the arbitration agreement is invalid as a matter of law under the Jones Act, 46 U.S.C. § 30104, and sections 5 and 6 of the Federal Employers Liability Act (“FELA”), 45 U.S.C. § 51 et seq. Because I believe that the majority’s decision to reverse does not take adequate account of the historic importance and purpose of both the Jones Act and FELA, and of their unique protections for specific categories of workers, such as seamen, I respectfully dissent.
*128 I.
Plaintiff-Appellee Frederick Harrington (“Harrington”) is a former seaman who sustained a serious back injury during the course of his employment with Weeks Marine, Inc (“Weeks Marine” or “Appellant”). After being diagnosed with herniated disks and being told by his doctor that he required surgery, he contacted Weeks Marine to request further financial support that would enable him to finance his surgery. Three months later, and just days before Harrington was scheduled to undergo major surgery — a fact of which the District Court found Weeks Marine was aware^ — Weeks Marine responded by mailing Harrington a Claim Arbitration Agreement (“Agreement”). In the Agreement, Weeks Marine offered to pay Harrington 60 percent of his gross wages up to a certain time as an advance on a potential settlement, provided that Harrington agree to arbitrate all of his claims.[1] Five days after his surgery, and while under the influence of large doses of both prescription pain medication and alcohol, Harrington signed the Agreement. The District Court found that Weeks Marine was aware of Harrington’s heavily medicated state when he signed the Agreement and was also aware that Harrington was “financially vulnerable”: he was an “injured seaman attempting to survive on a mere $20.00 per day” who was living with and being supported by his elderly father. Harrington v. Atlantic Sounding Co., Inc., No. 06-CV-2900, 2007 WL 2693529, at *4 (E.D.N.Y. Sept. 11, 2007).
In addition, Harrington manifestly lacked legal sophistication. When he testified before the District Court, “it was clear that he had difficulty understanding the questions and articulating his responses.” Id. at *5. The District Court was able to glean from Harrington’s testimony that he did not know the meaning of the word “arbitration” and was unfamiliar with his legal remedies under the Jones Act. Rather than helping an employee like Harrington understand the contract he was to sign, the agreement Weeks Marine sent obfuscated as much as it clarified. The Agreement did not use plain English and failed to make clear that, by signing, Harrington waived his right to a jury trial. In fact, the Agreement was framed in a way that could reasonably lead a signatory to believe he was not relinquishing any rights at all: it provided that “[although [the company was] obligated to pay maintenance and cure” it was not “currently responsible or liable for any other damages under general maritime law, the Jones Act or any other applicable law.” J.A. 245. Harrington was never told that he was signing a legal document affecting his rights or told that he might wish to seek the advice of an attorney. In light of this, it is not surprising that Harrington believed that “because he was a good employee,” Weeks Marine was simply planning to pay him 60% of his wages until he could return to work, and he did not realize he was being asked to relinquish anything in return. See PL Decl. ¶ 9. Based on these findings of fact, which we must accept unless they are “clearly erroneous,” *129 see Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., 189 F.3d 289, 295 (2d Cir.1999), the District Court concluded that the Agreement requiring Harrington to arbitrate his Jones Act claims was unconscionable under New Jersey law, and accordingly denied Weeks Marine’s motion to dismiss or compel arbitration.
I would not reach the issue of unconscionability because I would hold that an Agreement requiring a seaman to arbitrate his Jones Act claim is invalid as a matter of law. See infra Part II. But because the majority holds otherwise, the majority addresses the District Court’s unconscionability determination and reverses it, concluding that the Agreement was not substantively unconscionable because it does not “shock[ ] the court’s conscience.” See Maj. Op. at 125. I find New Jersey law far less clear on this question than does the majority. But were I to decide the issue, I would agree with the District Court that the Agreement was unconscionable, even assuming, as the District Court did, that the burden of demonstrating unconscionability is on Harrington.[2]
Central to the majority’s holding is its conclusion that New Jersey contract law always requires a showing of significant substantive unconscionability in addition to procedural unconscionability. While the majority acknowledges that “New Jersey courts generally ... appl[y] a sliding-scale approach to determine overall unconscionability,” the majority ultimately explains that for a contract to be unconscionable under New Jersey law “it must include an exchange of obligations so one-sided as to shock the court’s conscience.” See Maj. Op. at 125 (internal quotation marks omitted). I do not understand New Jersey law to establish so formal a test, and instead believe that New Jersey courts’ actual application of unconscionability is much more nuanced and case-specific. See Delta Funding Corp. v. Harris, 189 N.J. 28, 912 A.2d 104, 111 (2006) (“The defense of unconscionability ... calls for a fact-sensitive analysis in each ease[.]”); Lucier v. Williams, 366 N.J.Super. 485, 841 A.2d 907, 911 (2004) (“There is no hard and fast definition of unconscionability”); see also Sitogum Holdings, Inc. v. Ropes, 352 N.J.Super. 555, 800 A.2d 915, 920 n. 12 (2002) (“It is not possible to define unconscionability. It is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula.”) (quoting James J. White & Robert S. Summers, Uniform Commercial Code 151 (4th ed.1996)). Therefore, rather than approaching unconscionability as though it contained discrete elements, New Jersey courts have frequently emphasized, when evaluating contracts of adhesion, that various factors must be considered, and these factors have “procedural and substantive aspects.” See Delta Funding Corp., 912 A.2d at 111; Rudbart v. North Jersey Dist. Water Supply Comm’n, 127 N.J. 344, 605 A.2d 681, 687 (1992) (“[I]n determining whether to enforce the terms of a contract of adhesion courts have looked ... to ... the subject matter of the contract, the parties’ relative bargaining positions, the degree of economic compulsion motivating the ‘adhering’ party, and the public interests affected by the contract.”).
Underlying New Jersey courts’ consideration of these various factors appears to be a general concern about asymmetry between contracting parties, which, when this asymmetry rises to a certain level, *130 makes judicial enforcement of a contract unfair. New Jersey’s sliding-scale approach to unconscionability reflects a view, first, that this unfairness can manifest itself in a contract’s formation and also in its terms, and second, that these two manifestations are interrelated. This seems perfectly sensible. If two parties of relatively equivalent bargaining power negotiate contractual terms, courts will rightly be skeptical when one party later claims that the agreement was so one-sided as to preclude its enforcement. By contrast, when there is overwhelming procedural unconscionability in the formation of a contract, a court may well believe that the contract is unconscionable based on a lower degree of unfairness in the ultimate terms. See Muhammad v. County Bank of Rehoboth Beach, 189 N.J. 1, 912 A.2d 88, 97 n. 3 (2006) (indicating that a sliding scale analysis may be appropriate in the context of adhesion contracts and that when a contract involves “overwhelming procedural unconscionability” this should be factored into the unconscionability analysis); Sitogum Holdings, 800 A.2d at 923 (endorsing a sliding scale approach to unconscionability, and holding that a claim for unconscionability should not be barred “when one factor [ie. procedural or substantive] is greatly exceeded, while the other only marginally so”).
I take as valid the District Court’s findings of fact, and based on these findings, I think it is manifest that there was dramatic procedural unconscionability in this case. While this would not in itself render the agreement to arbitrate unenforceable, see Delta Funding Corp. v. Harris, 912 A.2d at 111, it does mean that, under New Jersey law, a lesser degree of substantive unfairness than the majority seems to demand suffices to make the Agreement unenforceable. Here, in exchange for an advance against a potential settlement that (under the District Court’s findings) was offered in a procedurally outrageous manner, Harrington gave up substantial rights uniquely afforded to Jones Act plaintiffs. Agreeing to arbitration did more than deprive Harrington of a jury trial, which is of course a necessary consequence of all arbitration agreements and so not ordinarily enough to constitute substantive unconscionability. See Perry v. Thomas, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Rather, the Agreement deprived Harrington of a whole panoply of important choices, the existence of which reflects the specific decision by Congress to confer significant procedural advantages on seamen under the Jones Act. I will discuss these choices in detail in the section below; for now it is enough to note that they include the ability to elect unilaterally between a jury or non-jury trial and to choose — to a degree virtually never seen elsewhere — the forum that he believes to be most favorable in which to bring his claim. See infra Part II.
I do not need to decide whether the overall Agreement or any of its individual provisions “shock my conscience” as a judge. For I do not believe that conscience-shocking terms are in practice required to find unconscionability in New Jersey in circumstances like those before us. The question is a close one. And, more than anything, I believe this case demonstrates the general undesirability of giving federal courts the last word on the interpretation of state law in a given case. See Guido Calabresi, Federal and State Courts: Restoring a Workable Balance, 78 N.Y.U. L.Rev. 1293, 1300 (2003) (“[Federal courts often get state law wrong because federal judges don’t know state law and are not the ultimate decisionmakers on it.”). In its effort to interpret New Jersey law, the majority articulates a rule for contractual unconscionability that the Agreement at issue cannot meet because *131 the Agreement’s terms are not “shocking.” The majority’s interpretation of New Jersey law to require this, even in the face of important procedural unconscionability, is not untenable. But I do not believe it is one that the New Jersey Supreme Court would adopt if we could certify the question to them. Unfortunately, the New Jersey Supreme Court does not accept certification from us.[3] As a result, the majority and I must “guess” as to state law, and we come out in opposite ways.
In short, while I agree that a contract to arbitrate one’s claims would not by itself be deemed substantively unconscionable by New Jersey in the typical case, see Maj. Op. at 126, I believe that New Jersey would find Harrington’s case not to be typical.
II.
This case can, however, also be properly resolved without recourse to any questions of state contract law. Harrington, supported by amicus curiae American Association for Justice (“AAJ”), argues that the Agreement is void as a matter of law. I agree, and consider this an appropriate alternate ground for affirming the District Court’s judgment. See Prisco v. A & D Carting Corp., 168 F.3d 593, 610 (2d Cir.1999) (explaining that we may “affirm the judgment of the district court on any basis for which there is a record sufficient to permit conclusions of law” (quotation marks omitted)).
A.
The Jones Act, officially entitled “The Merchant Marine Act of 1920,” was enacted to provide a cause of action in negligence for any seaman “injured in the course of employment.” 46 U.S.C. § 30104. The Act followed a long tradition of solicitude for the rights and interests of seamen by both legislatures and courts that dates back to the First Congress. See Garrett v. Moore-McCormack Co., 317 U.S. 239, 246, 63 S.Ct. 246, 87 L.Ed. 239 (1942) (recognizing “[o]ur historic national policy, both legislative and judicial” directed to the safeguarding of seamen’s rights). In an oft-quoted case, Justice Story, sitting on Circuit in 1823, discussed the judicial solicitude accorded to seamen in admiralty, and explained how this solicitude should inform a court’s interpretation of the contracts into which seamen enter:
Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel.... [Cjourts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty[J ... If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken *132 of the situation of the weaker party, and that protanto the bargain ought to be set aside as inequitable.... And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.
Harden v. Gordon, 11 F.Cas. 480, 485 (Cir.Ct.Me.1823) (Story, J.).
Growing out of this tradition, the Jones Act sought to fill a remedial gap that existed for the personal injury claims of this group of especially vulnerable workers. General maritime law prevailing pri- or to the enactment of the Jones Act allowed a seaman to receive “maintenance and cure” from his employer and damages attributable to a ship’s unseaworthiness, but did not permit a suit in negligence against either the ship’s master or any member of the crew. See Chandris, Inc. v. Latsis, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (citing The Osceoloa, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903)). State workers’ compensation schemes — which were first adopted in the decade preceding the Jones Act and quickly proliferated despite challenges to their validity, see Dan B. Dobbs & Paul R. Hayden, Torts and Compensation 916 (5th ed.2005) — might have conceivably filled this gap, albeit non-uniformly. But this possibility was apparently precluded by a series of much-criticized[4] Supreme Court decisions authored by Justice McReynolds prohibiting the application of state compensation laws to maritime workers.[5]
The Jones Act was, therefore, enacted by a Congress a) that recognized seamen as a group meriting solicitude and protection, and b) that also realized that then-current law provided them with inadequate *133 recourse when they suffered injuries resulting from the hazards of their employment. Hence, the Act removed the bar for a suit based on negligence, defined negligence extremely broadly, and provided seamen with heightened legal protection as workers merited by “their exposure to the perils of the sea.” Chandris, 515 U.S at 354, 115 S.Ct. 2172 (internal quotation marks omitted).[6] These protections extended beyond the change in substantive law; the Act provides seamen plaintiffs with powerful procedural rights, such as the unilateral right to elect between jury and non-jury trial.[7]
Many of the Jones Act’s rights and protections are conferred by reference to the rights and protections afforded by law to railway employees — another group of workers engaged in an industry that was extremely dangerous, of national importalice, and under the aforementioned Supreme Court decision, see supra 132 & n. 5, not readily covered by state workers’ compensation laws. See 46 U.S.C. § 30104 (“Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.”). As the Supreme Court has explained, this provision of the Jones Act “adopt[ed] the entire judicially developed doctrine of liability under [FELA].” Am. Dredging Co. v. Miller, 510 U.S. 443, 456, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (quotation marks omitted). FELA includes several provisions that both provide plaintiffs with significant procedural rights and protect those rights from subversion by counterparties with superior bargaining power. FELA section 6 provides an expansive federal venue provision, 45 U.S.C. § 56,[8] expressly recognizes *134 concurrent jurisdiction in the state courts, 28 U.S.C. § 1445(a),[9] and bars a defendant from removing FELA claims (and by extension Jones Act claims) to federal court, 45 U.S.C § 56. The combination of these provisions gives the plaintiff in either a FELA or Jones Act case almost limitless forum choices that the defendant cannot disturb. Moreover, FELA section 5 protects the rights established under the Act by declaring void “[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter.” 45 U.S.C. § 55. In adopting this section, Congress sought to be “comprehensive” by using a “generic, rather than a specific, description.” Philadelphia B. & W.R. Co. v. Schubert, 224 U.S. 603, 611, 32 S.Ct. 589, 56 L.Ed. 911 (1912); see also Duncan v. Thompson, 315 U.S. 1, 6, 62 S.Ct. 422, 86 L.Ed. 575 (1942) (surveying legislative history of FELA and concluding that “Congress wanted Section 5 to have the full effect that its comprehensive phraseology implies”).
In Boyd v. Grand Trunk Western Railroad, 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55 (1949), the Supreme Court applied FELA section 5 to invalidate a post-injury agreement that, in consideration for a monetary advance, restricted a railroad employee’s choice of venue for his FELA action. After explaining that, under FELA section 6, the defendant was liable to suit in the state court in which the plaintiff filed his claim, the Court held that the “right to bring the suit in any eligible forum is a right of sufficient substantiality to be included within the Congressional mandate of s. 5 of [FELA].” Id. at 265, 70 S.Ct. 26. Accordingly, the contract limiting plaintiffs choice of venue was declared void under FELA section 5. To hold otherwise, the Court asserted, would “thwart the express purpose” of FELA by allowing the use of a “device” to defeat plaintiffs “substantial right” granted in FELA section 6 to select the forum. Id. at 266, 70 S.Ct. 26.
I believe that Boyd is controlling in this case, and that faithful adherence to that long-established precedent requires that we find the arbitration agreement at issue in this case void as a matter of law. The Agreement that Weeks Marine entered into with Harrington is a contract or “device” whose purpose is to deprive Harrington of the substantial right to choose the forum in which to bring his claim. The majority tries to distinguish Boyd, but its attempt is ultimately unconvincing.
First, Boyd’s, prohibition on venue selection agreements fully applies to Jones Act cases. This is the plain implication of 46 U.S.C. § 30104, which, as previously noted, has been interpreted to adopt under the Jones Act “the entire judicially developed doctrine of liability” under FELA. Am. Dredging Co., 510 U.S. at 456, 114 S.Ct. 981 (quotation marks omitted). Following this clear and comprehensive instruction, we have not hesitated to recognize that rules governing jurisdiction and venue under FELA apply with full force to Jones Act claims. See Cal. Pub. Employees’ Ret. Sys. v. WorldCom., Inc., 368 F.3d 86, 99 (2d Cir.2004) (acknowledging that Jones Act cases are made non-removable by 28 U.S.C. § 1445(a), which precludes removal to federal court in civil actions “against a railroad or its receivers or trustees”); see *135 also Nunez v. Am. Seafoods, 52 P.3d 720 (Ala.2002) (holding that Boyd applies to Jones Act claims and invalidating a forum selection clause that restricted the plaintiffs’ ability to bring his Jones Act suit in any eligible forum).[10]
Second, contracts mandating arbitration of a Jones Act claim, such as the Agreement at issue here, directly implicate FELA section 5 and Boyd. Harrington brought suit in the District Court for the Eastern District of New York. “It is not disputed that [Appellant] is liable to suit,” Boyd, 338 U.S. at 265, 70 S.Ct. 26, in that forum under the Jones Act. The Agreement compelling arbitration, however, if enforced, would prevent Harrington from being able to pursue his claims in that forum. Accordingly, the Agreement deprives Harrington of the “substantial right” to bring suit in “any eligible forum,” and effectively allows Weeks Marine to contract out of liability to be sued in the jurisdiction Harrington selected. See id. at 265-66, 70 S.Ct. 26; Krenger v. Penn. R.R. Co., 174 F.2d 556, 559 (2d Cir.1949) (Op. of Clark, J.). It follows that the Agreement contravenes FELA section 5 and is void.
The majority fails to recognize this point when it argues that Boyd protected only the right to bring claims in an eligible forum, and that the arbitral forum to which the Agreement shifts Harrington’s right to adjudication is both eligible and favored. See Maj. Op. at 121-22. Boyd did not merely protect a plaintiffs ability to adjudicate his claim in some eligible forum. The contract at issue in Boyd did not, after all, prevent that, because it recognized as eligible fora both the state county court and the federal district court where the plaintiff resided at the time of his injuries (or alternatively the state and federal fora in which the injuries were sustained). See Boyd, 338 U.S. at 263-64, 70 S.Ct. 26. Instead, Boyd interpreted FELA section 5 to protect the plaintiffs right to bring his claim in any forum that was made eligible to him by statute, because the Court recognized that “[t]he right to select the forum” that was granted by FELA section 6 was a “substantial right.” Id. at 266, 70 S.Ct. 26 (emphasis added). It is this fundamental FELA/ Jones Act right “to select” that the Agreement before us takes away from Harrington. Cf. Scherk v. Alberto-Culver Co., 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (“An agreement to arbitrate before a specified tribunal is, in effect, a special kind of forum-selection clause.... ”).
B.
I recognize that other courts have held that FELA sections 5 and 6 and Boyd do not preclude the enforcement of a seaman’s agreement to submit Jones Act claims to arbitration. See Maj. Op. at 123- *136 24 (collecting cases). But those courts, like the majority here, reach this result by unjustifiably limiting the scope of the Supreme Court’s holding in Boyd.
The majority argues that the purpose of FELA section 6 is “to ensure the existence of a practical and convenient forum to adjudicate the employee’s rights,” and that an agreement to submit to an arbitral forum “without geographic constraints,” does not frustrate this purpose. See Maj. Op. at 122. By contrast, the majority argues, the agreement at issue in Boyd did impose a geographic restriction in the plaintiffs choice of venue. Certainly, convenience to the worker-litigant was one of the purposes behind § 6. See Baltimore & O. R Co. v. Kepner, 314 U.S. 44, 49-50, 62 S.Ct. 6, 86 L.Ed. 28 (1941). But this was not the provision’s only object. If it were, it would be hard to understand the Supreme Court’s decisions interpreting FELA section 6 to bar a state court from enjoining its citizens from suing railroad companies in the state courts of another state or in the federal district court of another state. See Miles v. Illinois Cent. R. Co., 315 U.S. 698, 62 S.Ct. 827, 86 L.Ed. 1129 (1942) (invalidating an injunction entered by a Tennessee state court against a Tennessee resident from further prosecuting her FELA claim arising from the death of her husband in a Missouri state court); Kepner, 314 U.S. at 51, 62 S.Ct. 6 (holding that FELA section 6 does not permit a state court to enter an injunction against the prosecution of a FELA claim in a remote federal district court in the face of the defendant railroad’s contention that the plaintiff was “acting in a vexatious and inequitable manner in maintaining the federal court suit in a distant jurisdiction when a convenient and suitable forum is at respondent’s doorstep”).
Congress had, in fact, more in mind than convenience. By allowing the injured workman to “choose from the entire territory served by the railroad any place in which to sue” and to choose between bringing his claim in either state or federal court, Congress also “intended to give the disadvantaged workman some leverage.” Miles, 315 U.S. at 707-08, 62 S.Ct. 827 (Jackson, J., concurring); see also Krenger, 174 F.2d at 561 (opinion of Hand, C.J.) (“[FELA] bears evidence that in the eyes of Congress employees do not bargain in all respects as equals with the roads.”). And Congress manifestly had the same intent to give seamen an edge, and to provide “heightened legal protections” when it passed the Jones Act. See Chandris, Inc., 515 U.S. at 354, 115 S.Ct. 2172. It did so, inter alia, by giving them these distinct procedural advantages: the unilateral right to seek a jury trial or a bench trial, and the ability to bring suit in any eligible forum. Boyd, I believe, recognized this, and it is wrong now to reduce its holding to a mere prohibition on contractual agreements that impede the plaintiffs ability to bring suit in a forum that is geographically convenient.
C.
This all leads to what is perhaps the most important issue in this case: the relationship between the Jones Act/FELA and the Federal Arbitration Act (“FAA”), 9 U.S.C. § 1 et seq. The question of whether the FAA requires enforcement of agreements to arbitrate claims brought under certain federal statutes is by now a familiar, if still often-difficult, issue. See, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26-27, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that a claim brought under the Age Discrimination in Employment Act was subject to the parties’ compulsory arbitration agreement); Desiderio v. Nat’l Ass’n of Sec. Dealers, Inc., 191 F.3d 198, 205 (2d Cir.1999) (find *137 ing no inherent conflict between the underlying purposes of Title VII and the 1991 Civil Rights Act and the imposition of compulsory arbitration). But the Jones Act and FELA are unique federal statutes in part because of their particular historical relationship to workers’ compensation laws. See supra at 132-33. I believe that this connection to workers’ compensation laws provides a strong reason to resist the reflexive assumption that some other courts have made that the “liberal federal policy favoring arbitration agreements,” Gilmer, 500 U.S. at 25, 111 S.Ct. 1647, necessarily trumps the particular worker-protection values that underlie these laws.
FELA and the Jones Act were passed at a time when legislative bodies throughout the nation were rethinking common-law rules that frequently operated to the great disadvantage of injured workers. See New York Cent. R. Co., 244 U.S. at 159-60, 37 S.Ct. 546 (Brandeis, J., dissenting) (describing the origin of FELA and explaining how common-law doctrines of fellow servant’s negligence, assumption of risk, and contributory negligence “practically abolished the liability of employers to employees” when they were applied to “huge organizations and hazardous occupations, as in railroading” resulting in “great hardship and apparent injustice”). While states began to remove some of these common-law barriers to recovery, in general— and most states took the more dramatic step of establishing liability without fault in the employment context through workers’ compensation laws — Congress acted analogously in protecting the at-risk workers who fell within the scope of its (then quite limited) Commerce Clause power. See Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 507-08, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) (describing FELA’s elimination of the common-law defenses of contributory negligence, the fellow servant rule, and assumption of the risk).[11] As Justice Douglas wrote with respect to FELA, the Act “was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations” by changing the strict rules of liability placed upon employees by the common law and providing employers with incentives to avoid or lessen hazards and risks. See Wilkerson v. McCarthy, 336 U.S. 53, 68, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Douglas, J., concurring).
FELA and the Jones Act did not go as far as state workers’ compensation laws sought to do in both forcing employers to internalize the accident costs of their operations and providing true insurance to employees because the two acts did not eliminate fault as the basis for recovery.[12] *138 Even so, as the Supreme Court made clear, Congress intended these statutes to “provide liberal recovery for injured workers” for the industries covered in a manner very much aligned with the spirit behind workers’ compensation laws adopted at the state level for other industries. See Kernan v. Am. Dredging Co., 355 U.S. 426, 431-32, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (describing change in public policy favoring compensation of employees and their dependents for “the losses occasioned by the inevitable deaths and injuries of industrial employment,” and explaining that while “[f]or most industries this change ha[d] been embodied in Workmen’s Compensation Acts,” FELA and the Jones Act provided the framework in the railroad and shipping industries, and gave to the courts the duty to fashion remedies for injured workers in a manner consistent with a policy of liberal recovery); see also Louis L. Jaffe, Res Ipsa Loquitur Vindicated, 1 Buff. L.Rev. 1, 15 (1951) (“The FELA serves as a glorified workmen’s compensation [statute.]”). This Circuit continues to recognize the distinctive nature of FELA and the Jones Act by applying relaxed standards of negligence and causation to claims brought under those statutes. See Williams v. Long Island R.R. Co., 196 F.3d 402, 406 (2d Cir.1999).
Thus, in a way, the Jones Act and FELA are akin to a federal attempt to provide workers’ compensation for injured employees. Accordingly, in trying to determine how the worker-protection policies embodied in those statutes interact with the FAA’s “strong federal policy favoring arbitration as an alternative means of dispute resolution,” Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 121 (2d Cir.2010) (internal quotations omitted), it is useful to look to the states’ treatment of arbitration in relation to workers’ compensation laws. In this regard, I find it instructive that a considerable number of states either bar or limit the scope of mandatory arbitration agreements in the context of workers’ compensation statutes.[13] It is also significant that, as a practical matter, relatively few agreements to arbitrate workers’ compensation disputes appear to exist. From this, one can derive the notion that the fundamental *139 rights given to workers in workers’ compensation are not as readily viewed as being subject to, or appropriate for, private resolution through arbitration.
This evaluation would not, of course, end the matter if the question we were addressing was the effect of the FAA on state workers’ compensation laws. For even in states that attempt to insulate workers’ compensation claims from mandatory arbitration, the FAA, being a federal law, is potentially preemptive. See Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). But regardless of that state/federal question,[14] what is one to say about the federal/federal relationship between the Jones Act/ FELA and the FAA? This is an entirely different question because it does not involve preemption. Whatever limits the FAA may be read to impose on state legislatures, Congress has the unlimited ability to privilege in federal statutes values that in some contexts it deems sufficiently important, without displacing the federal policy favoring arbitration agreements in most other circumstances. As the Supreme Court has repeatedly recognized, “all statutory claims may not be appropriate for arbitration,” and while parties generally will be held to their bargain to arbitrate, courts should not enforce an agreement to arbitrate specific statutory claims if “Congress ... has evinced an intention to preclude a waiver of judicial remedies for the statutory right at issue.” Gilmer, 500 U.S. at 26, 111 S.Ct. 1647.
Because the underlying right for workers protected by the Jones Act and FELA have been judged non-amenable to private resolution by legislative bodies conferring analogous rights in the workers’ compensation context, we should be reluctant to interpret the Jones Act and FELA to cede to the policy of the FAA. This is especially so as there are strong indications that Congress sought to insulate FELA and the Jones Act from agreements that would undercut the procedural structures of these laws, as arbitration inevitably would, just as many state legislatures have sought to do — mutatis mutandis — for state workers’ compensation laws. See Boyd, 338 U.S. at 266, 70 S.Ct. 26. FELA section 5 does not expressly reference agreements to arbitrate in the scope of its prohibition in the same manner as some states laws do with respect to workers’ compensation claims. This is not surprising given the modest use of arbitration at the time FELA and the Jones Act were enacted. Yet FELA section 5, much like those state laws, reflects an understanding that the procedural protections provided by laws for the compensation of injured workers are “part and parcel” of the substantive remedy provided. And that provision also demonstrates a judgment that agreements that we ordinarily allow and even favor— whether venue agreements or arbitration agreements — can be abused when applied to injured workers at a time of vulnerability. One need look no further than to the procedural background of the agreement in this case to understand the basis for such a judgment!
For all of the reasons stated above, I would affirm the judgment of the District Court and allow discovery in this case to *140 commence in a judicial forum. I therefore respectfully, but emphatically, dissent.

. Harrington received this initial Agreement from Weeks Marine on July 11, 2005 and signed it on July 23, 2005. Weeks Marine agreed to make advance payments to Harrington until Harrington was declared fit for duty, reached maximum medical improvement, or October 10, 2005, whichever came first. Therefore, in exchange for Harrington’s agreement to arbitrate, Weeks Marine agreed to advance his salary for an amount of lime that would at most be less than three months. When Harrington failed to recover, Weeks Marine did ultimately agree to extend the payments advanced for an additional three months pursuant to an "Addendum Agreement” that in other respects set forth the same terms and conditions as the original Agreement.

. It is possible to argue to the contrary. See Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239 (1942) (holding, in the context of a complete relinquishment of rights, that the burden of showing a release was knowing and voluntary lies on the seaman's counterparty).

. See N.J. Court Rule 2:12A-1 ("The Supreme Court may answer a question of law certified to it by the United States Court of Appeals for the Third Circuit, if the answer may be determinative of an issue in litigation pending in the Third Circuit and there is no controlling appellate decision, constitutional provision, or statute in this State.”); Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int’l B.V. v. Schreiber, 407 F.3d 34, 47 n. 6 (2d Cir.2005) ("[W]ere certification available to us, we might ... seek guidance from the New Jersey Supreme Court on the matter. But certification of the question to the New Jersey Supreme Court is not an option, because, under Rule 2:12A-1 of that court, certification is accepted by that court only from the Third Circuit.”).

. See, e.g., Am. Dredging Co. v. Miller, 510 U.S. 443, 458-62, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (Stevens, J., concurring in part and concurring the judgment) (referring to the Jensen doctrine as "ill-advised” and calling the case "just as untrustworthy a guide in an admiralty case today as Lochner v. New York ... would be in a case under the Due Process Clause”); Matthew H. Frederick, Note, Adrift in the Harbor: Ambiguous-Amphibious Controversies and Seamen’s Access to Workers’ Compensation Benefits, 81 Tex. L.Rev. 1671, 1706 (2003) ("It has become common sport to catalogue the abuse heaped upon Jensen over the years....”).

. See S. Pac. Co. v. Jensen, 244 U.S. 205, 217-18, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (holding that state worker's compensation award to family of a longshoreman killed on an ocean-going ship was unconstitutional because it addressed a subject matter reserved exclusively to Congress and the federal courts); see also Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 163-64, 40 S.Ct. 438, 64 L.Ed. 834 (1920) (invalidating as an impermissible transfer of legislative power a law passed by Congress in response to Jensen intended to permit the application of workers' compensation laws of the several states to injuries within the admiralty and maritime jurisdiction); State of Washington v. W.C. Dawson & Co., 264 U.S. 219, 222-23, 44 S.Ct. 302, 68 L.Ed. 646 (1924) (invalidating on the same ground a similar but more limited federal statute that excluded some maritime workers from its scope). A contemporaneous opinion by Justice Van Devanter also held that state workers’ compensation laws could not be applied to railway employees who were engaging in interstate commerce. New York Cent. R. Co. v. Winfield, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917). Relying on a theory of field preemption, the Court concluded that the remedy established by Congress in passing FELA was meant to be exclusive. See id. at 151-53, 37 S.Ct. 546.
In 1927, Congress ultimately did adopt its own workers' compensation law, but only for non-seamen maritime workers. See Longshoremen’s and Harbor Workers' Compensation Act ("LHWCA”), 33 U.S.C. § 901 et seq.; id. § 902(3)(G) (excluding "a master or member of a crew of any vessel” from the coverage of LHWCA); see also Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 87, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991) (describing this provision as a "refinement” of the term "seamen” in the Jones Act).

. The majority, relying on dicta from one of our cases, expresses doubt about whether the solicitude traditionally afforded to seaman is still applicable because "[t]he modern reality is that most seamen are no longer 'friendless.’ ” Maj. Op. at 122 n. 3 (quoting Ammar v. United States, 342 F.3d 133, 146 (2d Cir.2003)). Leaving aside the irony of invoking this (ultimately empirical) notion in a case involving a litigant as helpless as Harrington, it is notable that in the passage the majority quotes, the court was addressing a seaman’s maintenance claim in the shadow of a collective bargaining agreement. See Ammar 342 F.3d at 146. Maintenance is a judicially fashioned duty based on general maritime law, see Wills v. Amerada Hess Corp., 379 F.3d 32, 52 (2d Cir.2004), and federal courts have also been vested with the power to adopt federal common law governing the enforcement of collective bargaining agreements, see Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). By contrast, this case involves statutory interpretation, in which case it is the intent of the Congress that enacted the Jones Act that matters. See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). The majority might view as anachronistic the solicitude that Congress in 1920 exhibited toward seamen, but we as federal courts have not been given the power to update supposedly out-of-date statutes, whatever the academic merits of such proposals. See Hayden v. Pataki, 449 F.3d 305, 367 (2d Cir.2006) (in banc) (Calabresi, J., dissenting).

. See 46 U.S.C. § 30104 ("A seaman injured in the course of employment ... may elect to bring a civil action at law, with the right of trial by jury, against the employer.”); Panama R. Co. v. Johnson, 264 U.S. 375, 392, 44 S.Ct. 391, 68 L.Ed. 748 (1924) (rejecting Fifth Amendment Due Process challenge to Jones Act premised on argument that the Act "permits injured seamen to elect between varying measures of redress and between different forms of action without according a corresponding right to their employers”); Craig v. Atlantic Richfield Co., 19 F.3d 472, 476 (9th Cir.1994) ("The plain language of the Jones Act gives a plaintiff the option of maintaining an action at law with the accompanying right to a jury trial. The Act makes no mention of a defendant.”).

. Specifically, section 6 provides that an action under FELA may be brought in a federal district that is "in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall *134 be doing business at the time of commencing such action.” 45 U.S.C. § 56. The last of these options makes this venue provision especially broad.

. As the majority explains, this "non-removal” language was originally part of FELA section 6, but has subsequently been amended out and has been replaced with language to the same effect in 28 U.S.C. § 1445(a).

. But see Terrebonne v. K-Sea Transp. Corp., 477 F.3d 271, 281 (5th Cir.2007). Terrebonne is more than unpersuasive, however. The Terrebonne court held that the venue provisions of FELA section 6 did not apply to the Jones Act because the Jones Act had its own venue provision. As a result, the court reasoned, FELA section 5, as interpreted by Boyd, did not apply to protect the plaintiff’s choice of venue in a Jones Act case. Whatever the merit of the Terrebonne's holding on this point — -and I believe it was in error — the predicate for the court’s reasoning has been totally undercut by subsequent legislation that deleted the Jones Act’s separate federal venue provision. See National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110— 181, Title XXXV.C, § 3521, 122 Stat. 3, 596. The amendment was made retroactive to the last codification of the Jones Act in Public Law 109-304, which occurred on October 6, 2006. In a reply brief, Appellant all but concedes that this amendment to the Jones Act completely undermines this aspect of Terrebonne. See App.2d Rep. Br. at 4 n. 2.

. Congress passed amendments to FELA in 1939 to proscribe, in no uncertain terms, judicial invocation of the assumption of risk defense and to eliminate other "fetters” to recovery imposed by federal courts implementing the initial 1908 legislation. See Rogers, 352 U.S. at 508-09, 77 S.Ct. 443.

. This limitation was often lamented. See, e.g., Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 539, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957) (Frankfurter, J., dissenting) (describing application of common-law doctrine of negligence to injuries suffered by railroad employees — as opposed to provision of true workers' compensation — as "archaic” and "cruel”); Miles, 315 U.S. at 707-08, 62 S.Ct. 827 (Jackson, J., concurring) (characterizing FELA as maintaining a "medieval system” of compensation that gives injured workers and their survivors "only a lawsuit” rather than "a remedy”); see also Clarence A. Miller, The Quest for a Federal Workmen’s Compensation Law for Railroad Employees, 18 Law & Con-temp. Probs. 188 (1953) (documenting (ultimately failed) efforts subsequent to FELA's enactment in 1908 to establish federal workers’ compensation laws).
Unlike railway workers, seamen do also have the ability to obtain limited no-fault recovery for maintenance and cure, a remedy recognized as implied in contracts of marine *138 employment. See Aguilar v. Standard Oil Co. of N.J., 318 U.S. 724, 730, 63 S.Ct 930, 87 L.Ed. 1107 (1943). "Maintenance includes sustenance and a berth while aboard ship and payment for the cost of board and lodging while ashore. Cure refers to proper care of the injured seaman.” Mooney v. City of New York, 219 F.3d 123, 127 n. 1 (2d Cir.2000).

. E.g., Mont.Code § 27-5-114(2) (stating that pre-dispute arbitration clauses are valid and enforceable "except [for] ... (d) claims for workers' compensation”); Neb.Rev.Stat. § 25-2602.01(e) (indicating that provisions establishing validity of written arbitration agreement "do not apply to a claim for workers' compensation”); S.C.Code § 15-48-10(b)(2) ("[NJotwithstanding any other provision of law, employers and employees or their respective representatives may not agree that workmen’s compensation claims ... shall be subject to the provisions of this chapter and any such provision so agreed upon shall be null and void.”). Other states do not specifically exempt workers’ compensation claims from the scope of arbitration statutes, but instead attempt to exclude a larger class of claims that likely includes workers' compensation claims. E.g., Ga.Code § 9-9-2 (excepting a variety of contracts from state’s arbitration provision including agreements to arbitrate "future claims arising out of personal bodily injury or wrongful death based on tort”); Iowa Code § 679A.1 (declaring enforceability of written arbitration agreements except as applied to, inter alia, "[a] contract between employers and employees”); Wis. Stat. § 788.01 (same).
To be clear, I do not intend to say anything about the ultimate validity of these statutes. My point is only that they exist, and that this suggests something about whether legislatures that establish workers’ compensation systems believe those claims should be subject to mandatory arbitration.

. Some courts have found, without much discussion, that the FAA does preempt state laws that do not permit agreements to arbitrate workers’ compensation claims. See, e.g., Miller v. Public Storage Mgmt., Inc., 121 F.3d 215, 218 (5th Cir.1997). The issue rarely arises in federal courts, however, and does not appear to have been considered by this Circuit.